IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

TECHNICAL FURNITURE GROUP, LLC.   *

      Plaintiff   *

vs.   * CIVIL ACTION NO. MJG-06-3424

CBT SUPPLY, INC., et al.   *

      Defendants   *

\*   \*   \*   \*   \*   \*   \*   \*   \*

MEMORANDUM OF DECISION

The Court has held a bench trial of the Plaintiffs' claims brought under 35 U.S.C. § 256[1] presented in Counts I and II of the Third Amended Complaint Counts [Document 91]. The Court has heard the evidence, reviewed the exhibits, considered the materials submitted by the parties, and had the benefit of the arguments of counsel.

The Court now issues this Memorandum of Decision as its findings of fact and conclusions of law in compliance with Rule 52(a) of the Federal Rules of Civil Procedure.

---

[1] The Court did not try, and now finds moot, Defendants' affirmative defenses to Counts I and II based on the doctrine of equitable estoppel.

I.  BACKGROUND

Plaintiff Peter Stengel ("Stengel") was, among other things, engaged in the design and marketing of commercial[2] furniture beginning in the 1960's and continuing through the events at issue herein. Defendant Jeffrey Korber ("Korber") was, among other things, engaged in the production and sale of commercial furniture at all times pertinent hereto.

By no later than the 1990's, Stengel and Korber became acquainted. In or about 1998, Stengel and Korber entered into a business relationship relating to the design, manufacture and sale of commercial furniture.

The issues presented in the instant case relate to:

1. The May 23, 2006 issuance by the Patent and Trademark Office ("PTO") of United States Patent 7,047,890 ("the '890 Patent") entitled "Integrated Flat Panel Workstation System" to Stengel, Korber and James Babcock ("Babcock') as co-inventors.

2. The April 24, 2007 issuance by the PTO of United States Design Patent D541,084 ("the Piano Design Patent") on a "piano" style design for a multi-workstation system to Stengel and Korber as co-inventors.

3. The allegation that fraud was perpetrated to obtain the signature of Plaintiff Thomas White on a document assigning certain intellectual property rights, including rights in the application that led to the '890 Patent.

---

[2] The term "commercial" as used herein includes education-related furniture.

4.  The extent of White's ownership rights, if any, in the '890 Patent and other intellectual property.

By the end of 2005, the Stengel - Korber business relationship soured. On December 29, 2005, Stengel[3] and Smartdesks, Inc. filed suit against Korber and CBT Supply, Inc ("CBT") presenting claims based upon alleged violations of certain intellectual property rights and other theories. <u>Smartdesks, Inc. v. CBT Supply</u>, MJG-05-3456 ("the Smartdesks case"). The Smartdesks case is presently pending.

On December 26, 2006, Plaintiff Technical Furniture Group, Inc. ("TFG") commenced the instant lawsuit against Korber and CBT. Thereafter, White joined as a party plaintiff.

In the instant case, Plaintiffs assert:

Count I:  That the Court should declare that White is a co-inventor of the '890 Patent, that Korber and Babcock are not co-inventors, and that the '890 Patent should name Stengel and White as the only co-inventors.

Count II  That the Court should declare that Stengel's son, Jasen Stengel, is a co-inventor of the Piano Design Patent, that Korber is not a co-inventor and that the Piano Design Patent should name Peter and Jasen Stengel as the co-inventors.

---

[3] Stengel died in February 2006 and his estate was substituted for him as a Plaintiff in the Smartdesks case.

  Count III  That Korber defrauded White into signing an Assignment regarding certain intellectual property rights, including rights in the application that led to the '890 Patent.

  Count IV  That the Court should declare that the aforesaid Assignment is invalid and that White is the owner of the purportedly assigned rights.

The Court severed the inventorship issues presented in Counts I and II for bench trial.

## II. LEGAL PRINCIPLES

The patent statute provides that:

> Whenever through error a person is named in an issued patent as the inventor, or through error an inventor is not named in an issued patent[4]. . . [a] the court before which such matter is called in question may order correction of the patent. . .

35 U.S.C. § 256. However, a party seeking to challenge the inventorship reflected on an issued patent bears a heavy burden.

As stated by the Federal Circuit,

> "Patent issuance creates a presumption that the named inventors are the true and only inventors." Caterpillar Inc. v. Sturman Industries, Inc., 387 F.3d 1358, 1377 (Fed. Cir. 2004).

---

[4] "and such error arose without any deceptive intention on his part."

4

A party may rebut this presumption by proving his inventorship claim by clear and convincing evidence. See, e.g., Checkpoint Systems, Inc. v. All-Tab Sec. S.A., 412 F.3d 1331, 1338 (Fed. Cir. 2005). Furthermore, the burden is rendered even heavier by virtue of the requirement that the self serving testimony of a person claiming to be an inventor with regard to a patent issued to someone else must be adequately corroborated. Of course, "each corroboration case must be decided on its own facts with a view to deciding whether the evidence as a whole is persuasive." Cooper v. Goldfarb, 154 F.3d 1321, 1331 (Fed. Cir. 1998).

For a person to be a joint inventor of a patent, that person must have collaborated in the inventorship. Thus, the putative joint inventor must "contribute in some significant manner to the conception or reduction to practice of the invention [and] make a contribution to the claimed invention that is not insignificant in quality, when that contribution is measured against the dimension of the full invention . . . ." Pannu v. Iolab Corp. 155 F.3d 1344, 1351 (Fed. Cir. 1998).

It is not necessary for every co-inventor to make the same type or amount of contribution to the invention. Ethicon, Inc. v. United States Surgical Corp., 135 F.3d 1456, 1460 (Fed. Cir.

1998). Rather, to be a co-inventor, one needs to perform only a part of the task that produces the invention. Id.

III. DISCUSSION

    A.   The '890 Patent

        1.   The Patent

The '890 utility Patent issued to Stengel and Korber pertains to a workstation (desk) containing a panel with a flat computer monitor attached to the underside. The panel is linked to a keyboard tray. When the keyboard tray is pulled out into working position, the panel is rotated so that the computer monitor is in position for use. When the keyboard tray is pushed back, the panel is restored to its flat position. See Figures 4 and 5 of the '890 Patent:


FIG. 5


FIG. 4

2.  <u>Inventorship</u>

The Court, having heard the evidence and evaluated the credibility of the witnesses, makes the following factual findings regarding the inventorship of the '890 Patent:

1.  Initially, Korber thought of applying the concept of a hatch cover, as on a boat, to a flat panel containing a computer monitor on a work station or desk top.

2.  Korber's idea was to have a "hatch" on a desk top that could serve as part of the work surface when closed and could open so as to expose a flat computer monitor.

3.  Korber, who was in extensive regular contact with Stengel regarding the design and other aspects of commercial furniture, discussed the idea with Stengel.

4.  Stengel and Korber collaborated and developed the original idea to the basic concept of having the hatch panel (with monitor attached underneath) linked to a keyboard tray by an arrangement whereby the hatch would be opened and closed as the keyboard was moved into and out of working position.

5.  Stengel and Korber, therefore, were co-inventors with regard to the basic concept that was eventually included in the '890 Patent.

6.  The project then moved to the phase of attempting to develop of a functional design and operational prototype.

7.  The first development effort, which included services from White (and his employees) in regard to fabrication, did not succeed in developing a workable design and/or a fully functional prototype.

7

8.  Korber, who was in constant communication with Stengel, became dissatisfied and decided that it was necessary to hire a professional engineer to complete the project.

9.  Korber - at his expense[5] - retained Babcock, an engineer, to work with Korber to create a design that would reduce the basic concept to a practical functioning product.

10. Babcock, starting with the basic concept, worked in collaboration with Korber and developed the design that was included in the '890 Patent.

11. Babcock and Korber were co-inventors with regard to the aspects of the invention developed after Babcock was engaged.

12. Accordingly, Stengel, Korber and Babcock were co-inventors of the '890 Patent. White was not a co-inventor.

As noted above, Plaintiffs have the burden of proving, by clear and convincing evidence, that the '890 Patent should not include Korber as a co-inventor but should be "corrected" to state that Stengel and White were the only co-inventors. Plaintiffs have not carried this burden of proof. In fact, the evidence establishes that the "890 Patent requires no "correction" with regard to inventorship.

The conclusion that Stengel, Korber and Babcock (but not White) were co-inventors of the '890 Patent is not solely based

---

[5] Or the expense of his corporation.

upon the testimony of Korber and Babcock but is amply supported by other evidence. For example, the evidence establishes that Stengel signed the formal declaration submitted to the PTO stating, under oath, that he had read the application for the '890 Patent in which Korber and Babcock were identified as co-inventors. Stengel raised no objection to having Korber included as a co-inventor. Stengel initially objected to including Babcock as a co-inventor, but ultimately acquiesced in doing so. Stengel did not suggest that White agreed be named as a co-inventor.

Stengel did not object to having Korber and Babcock deal directly with patent counsel in regard to the drafting of the patent application.

Plaintiffs' drawings, which Plaintiffs claim show an operational design completed prior to the engagement of Babcock, do not do so. Plaintiffs' drawings do not show a completed product design and, such as is presented thereon reflect a design materially different from the design included in the '890 Patent. For example:

1. The '890 Patent discloses "a slotted bracket [180] affixed to the underside of the desktop/work surface." '890 Patent, col. 4, line 63 -64. Plaintiffs' drawings show a critically different slot arrangement.

    2.    The '890 Patent includes Claim 6 that claims a workstation in which the panel is mounted "on opposing pivot shafts. Plaintiffs' drawings show an entirely different axle arrangement.

The documents pertaining to Babcock's engagement and work corroborate the testimony that Babcock started from the basic concept, utilizing nothing from any previous design efforts. Indeed, the fact that Babcock began with an incorrect understanding as to the placement of the computer monitor on the hatch is, in and of itself, confirmation that he was not starting with an earlier functional design. Moreover, the documents reflect an evolution of the design. For example, the initial proposal to Babcock suggested a design that included a damping effect upon both opening and closing the hatch but the final design had a damping effect operating upon only the closing of the hatch.

    3.    <u>Plaintiffs' Contentions</u>

Plaintiffs submitted a port-trial memorandum to supplement their arguments made at trial in final argument. A few comments are warranted.

Plaintiffs state that Stengel alone "conceived of the idea that would become the patent." Pl. Mem.[6] at 5. If Stengel had been alive, perhaps he would have so testified.[7] However, he did not. Plaintiffs have not presented evidence that the Court finds refutes Korber's testimony that it was Korber who had the initial "hatch" idea, that Korber presented this to Stengel and the two of them collaborated to develop the basic concept. Moreover, the Court finds the evidence to establish Korber's frequent product-related discussions with Stengel and Korber's active participation in product development. The Court finds no valid reason, much less a clear and convincing basis, to reject Korber's testimony as to his collaboration with Stengel.

Plaintiffs contend that Stengel and White "worked together to complete a working model as envisioned in Peter Stengel's drawings of which they were successful." Pl.'s Mem. at 5. The Court does not find that they completed a working model - at most they produced a partially functioning prototype with an unsuccessful design. An examination of the drawings Plaintiffs rely upon reveals undesirable design features - for example, the

---

[6] Plaintiff's Post-trial Memorandum. [Document 164].

[7] Although he would have had to explain how such a statement would be consistent with his contemporaneous agreement to name Korber as a co-inventor.

11

linkage between the hatch and keyboard with a slot arrangement that caused free movement by the keyboard during the opening and closing function. Plaintiffs have not proven that White was collaborating as an inventor in the initial project.[8] Furthermore, whatever White may have participated in prior to Babcock's engagement was not included in the '890 patent.

Plaintiffs argue that Korber, in order to "steal" the invention, deliberately ignored a successful prototype and hired Babcock to engage in the unnecessary exercise of creating a different engineering design for the basic concept. Plaintiffs state that the Court should find that Korber, coming to White's place of business on an unrelated matter, "observed the FlipIt[9] mechanism in its fully operational form" and that "Korber then told [White] that he hired an engineer who would work on it." Pl's Mem. at 12. The Court does not so find. It would have been irrational for Korber to refuse to use a successful plan and to expend the money, time and effort to develop a new design for an invention that Korber had agreed was being shared with Stengel.[10]

---

[8] Later, White did function as a co-inventor in regard to an application for a patent relating to retrofitting.

[9] A name used for the device in question.

[10] Moreover, even if Plaintiffs' extraordinary hypothesis were accepted - so that Babcock's design was not necessary - it is, nevertheless, Babcock's design that was disclosed in the '890 Patent.

12

Plaintiffs contend that the Court should not consider uncorroborated testimony from Korber and/or Babcock. See, e.g., Pl.'s Mem. at 6. However, the testimony of these witnesses, who are named inventors in the issued patent and thus enjoy presumptive inventorship, does not require corroboration to constitute admissible evidence. Caterpillar Inc., 387 F.3d at 1377. Moreover, as discussed above, there is ample corroboration for their testimony.

Finally, the Court finds unpersuasive Plaintiffs contention that it should find that Defendants made an "admission" by virtue of the fact that White was named as a co-inventor (and Babcock was not) on a continuation-in-part application relating to a retrofitting method. The Court finds no such admission. The defense agrees that White collaborated as a co-inventor of the claimed retrofitting process. There is no evidence that Babcock did anything with regard to retrofitting. Even if there were some principle of patent law that would have required naming Babcock as a co-inventor so that the patent attorney erred in drafting the retrofitting application, this circumstance would not constitute an admission by the Defendants of any evidentiary weight whatsoever with regard to the matters at issue herein.

In sum, the Court finds that Plaintiffs have not proven that the inventorship reflected on the '890 Patent should be "corrected" as they contend.

B.   The 'Piano Design Patent

The Piano Design Patent [U.S. Design Patent D541,084], issued to Korber and Stengel as co-inventors, pertains to a piano style design for a multi-workstation system of the type disclosed in the '890 Patent. See Figure 7 of the '890 Patent and Figure 2 of the Piano Design Patent.



FIG. 7



Fig. 2

The Court has before it the question of whether Plaintiffs have proven that Korber was not a co-inventor, and that Jasen Stengel was a co-inventor, of the Piano Design Patent.[11]

Korber is a named co-inventor, with Stengel, on the Piano Design Patent issued by the PTO. Hence, he is presumed to be a co-inventor. Caterpillar Inc., 387 F.3d at 1377. Plaintiffs must prove, by clear and convincing evidence, that Korber was not a co-inventor and Jasen Stengel was. Id.

Korber has testified that he collaborated with Stengel in the development of the Piano Design. Stengel, regretfully, died prior to trial. Even if Stengel had testified that Korber was not a co-inventor, there would be - at most - contradictory versions of fact from Stengel and Korber without evidence clearly and convincingly establishing that Stengel was truthful and Korber was not. Furthermore, the documentation tends to support Korber's position. Stengel signed a declaration submitted to the PTO with the application for the Piano Design Patent, stating, under oath, that he had read the application naming Stengel and Korber as the only co-inventors. Plaintiffs have not proven that Korber was not a co-inventor of the Piano Design Patent.

---

[11] The Court notes, but finds immaterial to the instant decision, issues regarding the publication of pictures and/or a prototype, of the piano design (with or without the legs shown in the Piano Design Patent).

15

The question whether Jasen Stengel is a co-inventor of the Piano Design Patent appears to have little if any, practical significance.[12] Nevertheless, the issue has been raised and shall be resolved.

Plaintiffs have proven that Jasen Stengel utilized computer software to prepare certain drawings used in the process of developing the design included in the Piano Design Patent. However, the pertinent inquiry is not whether Jasen Stengel prepared such drawings, but whether he was functioning as a co-inventor, rather than only as a draftsman, in this regard.

The Court does not find Plaintiffs to have proven, by clear and convincing evidence, that Jasen Stengel was collaborating as a co-inventor in regard to the Piano Design Patent. Jasen Stengel's self serving, largely conclusory, testimony that he collaborated with his father - even if it were completely accepted as true and sufficiently specific - was not adequately corroborated. Moreover, Stengel signed, under oath, a declaration submitted to the PTO stating that he had read the Piano Design Patent application naming Stengel and Korber - not Jasen Stengel - as co-inventors. And, Stengel did not direct,

---

[12] The Stengel "side" has all the rights of a co-inventor of the Piano Design Patent by virtue of Stengel's status as a co-inventor and would get no greater rights if Jasen Stengel were also a co-inventor.

suggest or request that Jasen Stengel be added as a co-inventor on the Piano design Patent.

Accordingly, the Court finds that Plaintiffs have not proven that Jasen Stengel was a co-inventor of the Piano Design Patent.

IV. <u>CONCLUSION</u>

For the foregoing reasons, the Court decides that:

1. Plaintiffs have not established that:

    a. Defendants Jeffrey Korber and/or James Babcock are not co-inventors of United States Patent 7,047,890.

    b. Plaintiff Thomas White is a co-inventor of United States Patent 7,047,890.

    c. Defendant Jeffrey Korber is not a co-inventor of United States Design Patent D541,084.

    d. Jasen Stengel is a co-inventor of United States Design Patent D541,084.

2. This case shall proceed with regard to Counts III and IV of the Third Amended Complaint and Defendant's Counterclaim.

SO ORDERED, on <u>Monday, August 11, 2008</u>.

/ s /
Marvin J. Garbis
United States District Judge